USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/21/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RENEE LEEHIM,
                              Plaintiff,

              -v-

NEW YORK CITY DEPARTMENT OF EDUCATION,
NEW YORK CITY BOARD OF EDUCATION and
CARMEN FARINA as Chancellor of the New York City
School District,

                              Defendants.
------------------------------------------------------------X

17 Civ. 3838 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Renee LeeHim brings this action against the New York City Department of Education ("DOE"), New York City Board of Education ("BOE"), and Carmen Farina as Chancellor of the New York City School District (collectively, "defendants"). LeeHim alleges discrimination on the basis of race and gender in violation of 42 U.S.C. §§ 2000e *et. seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 *et seq.* ("NYCHRL").

Defendants now move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court dismisses plaintiff's complaint in its entirety.

**I.**     **Background**

    **A.**     **Facts**[1]

---

[1] This account is drawn from the complaint. Dkt. 2 ("Compl."). For the purpose of resolving the motion to dismiss, all factual allegations in the complaint are presumed true. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

LeeHim, a black woman, was employed by defendants as Director of Capacity Building within the DOE's Office of Community Schools ("OCS") from September 15, 2015 until February 19, 2016. Compl. ¶¶ 1, 8. The OCS was created to implement the DOE's Community Schools Initiative, which aims to develop schools with robust social services such as afterschool programming, parent job training, student wellness assistance, and family engagement activities. *Id.* ¶¶ 12–13. The DOE, in turn, performs the administrative operations of the BOE, which is the government entity tasked with managing New York City's public school system. *Id.* ¶ 10.

As Director of Capacity Building, LeeHim was a member of the eight-member leadership team atop the OCS, led by Executive Director Chris Caruso and Deputy Executive Director Sarah Jonas. *Id.* ¶¶ 14, 21. Among leadership team members, LeeHim was the only black woman and one of only two non-white members. *Id.* ¶¶ 1, 21. LeeHim felt a special affinity for the job as a result of her own experience as a student who was "tracked" into lower-level high school courses rather than the advanced courses offered mainly to white students. *Id.* ¶¶ 16, 23.

Caruso and others made the decision to hire LeeHim. *Id.* ¶ 25. During the interview process, defendants represented that the position needed to be filled immediately. *Id.* ¶ 27. Yet within her first week of work, LeeHim was excluded from multiple meetings, "core work," and "communication streams." *Id.* ¶¶ 27–28. In her third week, LeeHim was "shushed" by a white male peer while a white donor berated her over the phone in what she perceived to be an inappropriate manner. *Id.* ¶ 28. The same donor also chastised LeeHim the following week for being "too aggressive" and "young" to serve in her position, asking whom LeeHim knew to help her get hired. *Id.* After LeeHim apologized to the donor at Caruso's suggestion and generally expressed her desire for feedback and constructive criticism, Caruso described LeeHim as "not a

2

team player" and "too aggressive." *Id.* ¶ 29. This, LeeHim alleges, was an example of defendants ascribing to her "the most insidious racial stereotypes and preconceived notions." *Id.*

Several months later, during a meeting with the entire leadership team, LeeHim objected to the omission of the terms "equity," "achievement," and "student" from a draft of an OCS promotional document. *Id.* ¶ 31. When LeeHim challenged Caruso's reluctance to promote equity and diversity as priorities, Caruso responded with a "profane and angry tirade . . . including very personal attacks." *Id.* LeeHim fled the room in humiliation. *Id.*

The complaint also alleges that LeeHim was a victim of wage discrimination. *Id.* ¶ 42a.[2] Along with Jonas, LeeHim was one of only two members of the leadership team with K-12 classroom teaching experience and an advanced degree in education. *Id.* ¶¶ 1, 24.[3] Nevertheless, she received "among one of the lower salaries" on the OCS leadership team. *Id.* ¶ 42a. According to the complaint, this pay gap is consistent with a "striking disparity" between DOE's payment of men and women at the same seniority level. *Id.*

According to the complaint, as a result of the foregoing, LeeHim felt so suppressed, disrespected, and unwelcome as to force her to submit her resignation on February 1, 2016. *Id.* ¶¶ 1, 33. This resignation roughly coincided with the resignation of five other black women in middle- or high-ranking positions at the DOE. *Id.* ¶ 38. Since her resignation, LeeHim alleges, her position has been filled by others, "some or all" of whom are black. *Id.*

---

[2] The complaint contains two paragraphs numbered "41" and two paragraphs numbered "42." The Court refers to the first paragraphs 41 and 42 as "41a" and "42a" and the second paragraphs 41 and 42 as "41b"and "42b."

[3] Prior to her tenure as a director, LeeHim had received a master's degree in education, *id.* ¶¶ 1, 24, and, as of the filing of the complaint in this action, had begun to pursue a doctorate in Adult Learning and Leadership, *id.* ¶ 17. It is not clear whether she was a doctoral candidate at the time of the events described here.

## B. Procedural History

In July 2016, LeeHim filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶ 7. On February 23, 2017, the EEOC issued a right to sue letter. *Id.*

On May 22, 2017, LeeHim filed the complaint in this action. Dkt. 2. On July 31, 2017, defendants moved to dismiss. Dkt. 14. On August 10, 2017, the Court issued an order notifying LeeHim that she could file an amended complaint as a matter of course by August 21, 2017, or choose to file an opposition to the motion to dismiss by the same date. Dkt. 17. Following two extensions, *see* Dkts. 19, 24, on September 25, 2017, LeeHim, having chosen not to amend, filed an opposition to the motion to dismiss. Dkt. 25. On October 13, 2017, defendants filed a reply. Dkt. 26.

## II. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels

and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

### A. Pattern or Practice of Discrimination under Title VII

The complaint purports to raise two federal causes of action: "Pattern or Practice of Discrimination" under Title VII, and "Discrimination against Plaintiff in Violation of Title VII." *See* Compl. ¶¶ 42b–46. Plaintiffs pursuing Title VII relief under a pattern-or-practice framework need establish only the existence of a discriminatory policy, rather than all elements of a prima facie case of discrimination. *Chin v. Port Auth. Of N.Y. & N.J.*, 685 F.3d 135, 149 (2d Cir. 2012). But this framework is a method of proof, not a stand-alone cause of action, and it is "not available to private, nonclass plaintiffs." *Id.* As the Second Circuit has explained, an individual plaintiff may adduce evidence of an employer's general practice of discrimination to support her disparate treatment claim, but such evidence "cannot relieve the plaintiff of the need to establish each element of [her] claim." *Id.*

Because LeeHim brings this action on an individual basis, she may not establish liability solely by proving the existence of a discriminatory policy. The Court therefore proceeds to analyze LeeHim's individual Title VII disparate impact claim without reference to the pattern-or-practice method of proof.

### B. Individual Discrimination on the Basis of Race and Gender Under Title VII

An individual's claim of employment discrimination under Title VII is analyzed using the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). To establish a prima facie case of race or gender discrimination at the motion to dismiss stage, a plaintiff must show that: (1) she belongs

to a protected class, (2) she was qualified for the job, (3) she suffered an adverse employment action, and (4) she "has some minimal evidence suggesting an inference that [her] employer acted with discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). "The facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Id.* at 311.

The first two elements of the *McDonnell Douglas* framework are not disputed here. As a black woman, LeeHim is a member of two protected classes, and defendants do not dispute that she was qualified for her position. Rather, defendants move to dismiss on the third and fourth elements, arguing LeeHim has alleged neither an adverse employment action nor facts tending to demonstrate race or gender discrimination. As to the former, LeeHim argues that she adequately pleaded diminution in her status and responsibilities, constructive discharge, and disparate pay. As to the latter, she argues that she has raised a minimal inference of discriminatory motivation by alleging "events characterized by race-connected or race-driven actions." Pl. Br. at 24.

For the reasons that follow, the Court holds that LeeHim's complaint fails adequately to plead either an adverse employment action or facts giving rise to a minimal inference of discrimination. These lapses each independently require dismissal of LeeHim's Title VII claim.

### 1. Adverse Employment Action

An adverse employment action is a "*materially significant disadvantage* with respect to the terms of the plaintiff's employment." *Littlejohn*, 795 F.3d at 312 n.10 (emphasis in original). Examples include "termination, demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities." *Id.* (internal quotation marks omitted). Such

an action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

Here, LeeHim argues that she has alleged three adverse employment actions: exclusion from "core" work activities, constructive discharge, and disparate pay. *See* Pl. Br. at 16–24; *see also* Compl. ¶¶ 33, 35, 42. The complaint fails to plead facts that, if proven, would establish LeeHim's entitlement to relief.

### a. Exclusion from Core Work

LeeHim alleges first that defendants subjected her to discriminatory "diminution of duties" by excluding her from "core work," "communication streams," and meetings. Pl. Br. at 16 (quoting Compl. ¶¶ 27–28). LeeHim's primary complaint on this score is that she was first excluded from meetings and thereafter allowed to attend but ignored. *See* Compl. ¶ 28. Exclusion from meetings, however, typically does not constitute an adverse employment action. *See, e.g., Chan v. NYU Downtown Hosp.*, No. 03 Civ. 3003 (RMB), 2006 WL 345853, at *8–9 (S.D.N.Y. Feb. 14, 2006) (rejecting claim that exclusion from meetings constituted adverse employment action in Title VII retaliation case); *see also Quarless v. Bronx-Lebanon Hosp. Ctr.*, 228 F. Supp. 2d 377, 385–86 (same). Further, even if exclusion from meetings might, under certain circumstances, materially alter the terms or conditions of a plaintiff's employment, the allegations of the complaint here are far too general on this point. It fails to allege any specific meeting from which LeeHim was excluded, precluding any finding that exclusion from such a meeting or meetings amounted to a "significant" diminishment of her responsibilities.

Nor does the complaint provide sufficient allegations that LeeHim was otherwise excluded from work or ignored. LeeHim cites the complaint's allegations that she was (1) "shushed" by a peer and criticized by a donor, (2) criticized by Caruso as "not a team player" and

7

"too aggressive," and (3) attacked by Caruso in a "profane and angry tirade" after she objected to the removal of the words "equity," "achievement," and "student" from an OCS promotional document and challenged Caruso for failing to promote equity and diversity. Pl. Br. at 5, 19; Compl. ¶¶ 28–31.

None of these allegations, however, rises to the level of an adverse employment action. As the Second Circuit has explained, "criticism of an employee (which is part of training and necessary to allow employees to develop, improve, and avoid discipline) is not an adverse employment action." *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Even "excessively harsh criticism" will not suffice. *See Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 479 (2d Cir. 2009); *see also Katz v. Beth Israel Medical Center*, No. 95 Civ. 7183 (AGS), 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) ("Being yelled at [and] receiving unfair criticism . . . do not rise to the level of adverse employment actions."). Nor do "petty slights," such as shushing, amount to adverse employment actions. *See, e.g., Morales v. N.Y.S. Dep't of Labor*, 865 F. Supp. 2d 220, 256 (N.D.N.Y. 2012) (allegations that coworkers "shushed" plaintiff and commented "never a dull moment" in reference to plaintiff were non-actionable "petty slights"); *see also* Compl. ¶ 30 (characterizing the "hostile treatment [LeeHim] endured" as "petty or insulting behavior on occasion"). In short, LeeHim has alleged what may have been rude and intemperate conduct, but Title VII provides no remedy for such conduct, as it "does not set forth a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

   b.  **Constructive Discharge**

LeeHim alternatively argues that defendants' actions, taken together, constitute an adverse employment action inasmuch as they forced her to resign. *See* Compl. ¶ 33. As alleged in the complaint, LeeHim's "experience of discrimination . . . was more than a combination of merely several overt or discernible interactions with her supervisor or co-workers." *Id.* ¶ 33. Rather, "[t]he gravamen of her experience at her workplace was the constant and continually ongoing sentiment of suppression, disrespect and being treated as unwelcome." *Id.* This experience, punctuated by "so-called 'micro-aggressions,'" imposed on LeeHim "a chilling effect in [her] ability to execute her job" and therefore forced her resignation. *Id.* ¶¶ 33, 35.

A plaintiff may rely on a theory of constructive discharge to satisfy the third element of the *McDonnell Douglas* framework where "an employer discriminates against an employee to the point such that [her] 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)). Such a resignation is actionable because under these circumstances, "Title VII treats [the employee's] resignation as tantamount to an actual discharge." *Id.* at 1776–77. The Second Circuit has emphasized, however, that merely "difficult or unpleasant" working conditions will not suffice. *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360–61 (2d Cir. 1993). Accordingly, a constructive discharge may not be established solely through evidence that the employee was dissatisfied with her assignments or felt that her work was unfairly criticized. *Id.* at 360. Instead, the employee must show that her employer acted "deliberately" to make working conditions intolerable. *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007).

LeeHim pins her constructive discharge claim on allegations of a workplace "fraught with toxicity," where LeeHim saw "no palatable path toward continuing to function in her job."

Pl. Br. at 23. Her complaint, however, fails to illustrate deliberate employer conduct that rendered her circumstances intolerable. In the first place, the complaint consists largely of generalized allegations that do no more than state legal conclusions. *See, e.g.*, Compl. ¶ 26 ("From the very start of her employment . . . [LeeHim] never stood a chance to survive in her employment . . . ."); *id.* ¶ 30 ("The five months of Plaintiff's employment was a progressively worsening scenario in terms of not only the hostile treatment that she endured—petty or insulting behavior on occasion—but in how it paralyzed and disempowered her from fully performing her job . . . ."); *id.* ¶ 33 ("Routinely experiencing so-called 'micro-aggressions,' [LeeHim] was not treated as an equal among peers and felt too great a chilling effect in ability to execute her job . . . ."); *id.* ¶ 35 ("In the aftermath of the January 26 fallout, it was not reasonable for Plaintiff to have remained and to continue to function and perform her job and her resignation consequently was tantamount to a termination and constituted a constructive discharge or termination."). Such statements are not entitled to an assumption of truth and cannot give rise to an entitlement to relief. *See Iqbal*, 556 U.S. at 679.

To the extent that the complaint does offer more specifics as to allegedly toxic conditions that LeeHim faced, it alleges (as described above) that LeeHim was excluded from "core work," "communication streams," and "meetings," that she was ignored and criticized by her supervisors, and that she was subjected to an angry tirade. *See* Compl. ¶¶ 27–31. But under the case law, these facts alone cannot support an inference that LeeHim's working conditions were intolerable. In *Martin v. Citibank, N.A.*, for instance, the Second Circuit held that a plaintiff could not sustain a constructive discharge claim based on allegations that she had resigned because her supervisor embarrassed her in front of her colleagues, unfairly criticized her, and interfered with her ability to perform her duties. 762 F.2d 212, 221 (2d Cir. 1985). Here, as

10

there, the incidents as alleged "do not legally suffice to sustain an inference that a reasonable person would have been 'compelled' to resign." *Id.*

Moreover, even assuming the employment actions described in the complaint could support a claim for constructive discharge, LeeHim's claim suffers from other fatal defects. First, it nowhere alleges that defendants *deliberately* created intolerable circumstances with the intention of compelling LeeHim's resignation. *See Morris*, 481 F.3d at 88. Second, the complaint nowhere explains what job functions LeeHim was unable to perform as a result of defendants' conduct, leaving a factfinder with no basis to determine whether LeeHim was left with "no alternative but to resign." *Stetson*, 995 F.2d at 361. And third, the complaint fails to suggest that LeeHim took any steps short of resignation to alert her employers to her supervisor's alleged misconduct. *See Silverman v. City of New York*, 216 F. Supp. 2d 108, 115–16 (E.D.N.Y. 2002) ("[C]ourts in this circuit generally have refused to find a constructive discharge where an employee had an avenue through which he could seek redress for the allegedly 'intolerable' work atmosphere leading up to his resignation, but failed to take advantage thereof."); *see also Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1157 (2d Cir. 1993) (rejecting constructive discharge claim where plaintiff could have lodged a complaint with human resources rather than resign).

Because each of these deficiencies precludes a claim for constructive discharge, LeeHim cannot aggregate her individual allegations to generate an adverse employment action.

### c. Disparate Pay

Finally, LeeHim alleges that she suffered an adverse employment action in the form of receiving disparate pay. "Subjecting an employee to unequal pay can, of course, constitute a materially adverse employment action." *Humphries v. City Univ. of N.Y.*, No. 13 Civ. 2641 (PAE), 2013 WL 6196561, at *6 (S.D.N.Y. Nov. 26, 2013) (internal quotation marks omitted).

11

Because unequal pay is a relative concept, the key inquiry is whether the plaintiff has provided adequate comparators who are "similarly situated in all material respects." *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). What constitutes "all material respects" varies from case to case, but in the disparate pay context, a plaintiff typically must plead comparators' relevant experience and length of employment in order to raise an inference of discrimination. *See id.* at *7 (citing *Gupta v. N.Y.C. Sch. Const. Auth.*, 305 F. App'x 687, 689 (2d Cir. 2008) and *Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 405 (S.D.N.Y. 2010)).

Here, LeeHim has failed to plead facts sufficient to establish that she and any colleague were similarly situated. As concerns disparate pay, the complaint offers only the following: (1) LeeHim earned "among one of the lower salaries in contrast to the other members of the Leadership team"; (2) LeeHim was salaried at a G-3 level; (3) only LeeHim and Jonas had "actual academic K-12 teaching experience"; (4) LeeHim was the "best educated" director; (5) "[o]thers who have advanced degrees but not in education somehow are paid better despite having less relevant experience"; and (6) there is a "striking disparity . . . between what the DOE pays women and what it pays men who are all at the same seniority level among the Leadership Team." Compl. ¶ 42a.

Allegation (6) is an unacceptably conclusory generalization about DOE pay practices. The remaining allegations, although each references LeeHim, provide too scant a basis upon which a factfinder could find that similarly situated employees were subjected to disparate treatment. Although the complaint does reveal LeeHim's salary level, it does not provide that of any other director. Instead, it vaguely classifies LeeHim's salary as "among one of the lower salaries" in a group of only eight directors.

Further impairing the ability to assess the claim of unjustifiably disparate pay, the complaint provides no factual basis for the conclusion that LeeHim was the "best educated" director or had the most relevant experience. LeeHim suggests that her "actual academic K-12 teaching experience" and degree in education made her among the most qualified directors, but she fails to allege the experience and educational background of any of her colleagues save Jonas. *See Humphries*, 2013 WL 6196561, at *7. And the complaint itself suggests that K-12 teaching experience might not be the only qualification relevant to a director position. The Director of Capacity Building, for instance, was responsible for "aggregate planning, education programming and implementation, instilling and maintaining accountability in execution of programs, and management of a $100,000 budget for trainings." Compl. ¶ 22; *see also id.* Ex. 3 (explaining that the "Director of Capacity Building's role is to drive policy and investment decisions around training for community schools . . . [and to] design and execute initial and ongoing training opportunities for AmeriCorps and VISTA members"). This description suggests that members of the leadership team may have been more closely involved with administration than classroom teaching, in which case other backgrounds (*e.g.*, in business or administration) might be as or more valuable than a course of training in education. Regardless, the complaint's failure to set out the specific qualifications of LeeHim's comparators prevents a finding that the board members were similarly situated in all material respects, and thereby precludes even a "minimal inference that the difference of treatment may be attributable to discrimination." *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).

A final, related flaw in the disparate-pay allegation is the complaint's failure to allege the length of the other directors' tenures. LeeHim served as a director for five months. If the other seven directors were all senior to LeeHim, as appears at least possible, that LeeHim earned

"among one of the lower salaries," all else being equal, would be more justifiable. As the complaint stands, however, LeeHim has failed to provide a plausible basis to support the inference that LeeHim's co-directors were similarly situated in all material respects. *See Humphries*, 2013 WL 6196561, at *7.

In light of the foregoing, the Court therefore holds that LeeHim has failed to plead an adverse employment action.

### 2. Inference of Discriminatory Motivation

Even if the complaint had adequately pled an adverse employment action, dismissal would be required for an independent reason: LeeHim has failed to allege facts giving rise to a minimal inference that her termination occurred *because of* her race or gender.

An inference of discriminatory motivation may arise from circumstances including, but not limited to, an employer's (1) criticism of the plaintiff's performance in ethnically degrading terms, (2) invidious comments about others in the employee's protected group, (3) favorable treatment of employees not in the protected group, and (4) replacing a terminated or demoted employee with an individual outside the employee's protected class. *See Littlejohn*, 795 F.3d at 312–13. Where a plaintiff alleges invidious comments, the significance of those comments depends on the context in which they were made and whether, fairly considered, they themselves reveal discrimination or "tend[] to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Accordingly, courts will refuse to find an inference of discrimination absent some direct contextual link to a protected characteristic. *See, e.g., Williams v. Time Warner, Inc.*, 440 Fed. App'x 7, 9–10 (2d Cir. 2011); *Nguedi v. Fed. Reserve Bank of N.Y.*, No. 16 Civ. 636 (GHW),

2017 WL 2557263, at *5 (S.D.N.Y. June 12, 2017); *Moore v. Verizon*, No. 13 Civ. 6467 (RJS), 2016 WL 825001, at *7 (S.D.N.Y. Feb. 5, 2016); *Thelwell v. City of New York*, No. 13 Civ. 1260 (JGK), 2015 WL 4545881, at *10–11 (S.D.N.Y. July 28, 2015).

LeeHim alleges that members of the leadership team "ascribed to [her] the most insidious racial stereotypes and preconceived notions because she was not one of their own." Compl. ¶ 29. Yet aside from this conclusory allegation, the complaint offers no statements that refer directly to race. Rather, LeeHim suggests that statements characterizing her as "aggressive," "young," and "not a team player" were racially charged. *See* Compl. ¶¶ 28–29. But neither the complaint nor her briefing explains how these words, in context, functioned as coded appeals to racial stereotypes. *See Thelwell*, 2015 WL 4545881, at *11 (use of words "angry" and "aggressive" could not support Title VII claim absent context-specific evidence that the words amounted to racial "code words"); *Humphries*, 2013 WL 6196561, at *9 (use of words such as "angry" and "aggressive" could not support inference of discrimination absent "other concrete factual allegations" suggesting discriminatory motive).

To the contrary, the relevant context here suggests the *absence* of discriminatory intent. First, the supervisor who criticized LeeHim in allegedly racist terms was also the supervisor who hired her. Compl. ¶ 25. And second, LeeHim was replaced by a series of directors, "some or all" of whom were black. *Id.* ¶ 38. Under these circumstances, the inference does not fairly arise that the facially race-neutral criticism of LeeHim was coded racial stereotyping. *Cf. Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.").

At best, the complaint suggests that LeeHim acted as an advocate for certain policies with potential racial overtones or ramifications and was criticized in response. *See* Compl. ¶ 31 (citing LeeHim's objection to Caruso's failure to focus on "equity" in OCS promotional materials). But the complaint does not allege that Caruso's "profane and angry tirade" invoked race even implicitly. And LeeHim has not cited any authority to suggest that Title VII protects an employee from criticism arising out of policy advocacy touching on race.[4]

Nor can LeeHim's subjective sensation of discrimination salvage her claim. The complaint alleges that LeeHim was saddled with a "sentiment of suppression" as a result of Caruso's "tirade." *See id.* ¶ 33. But "feelings and perceptions of being discriminated against are not evidence of discrimination." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999). Accordingly, LeeHim's "subjective interpretation of her co-workers' use of . . . critical but facially non-discriminatory terms does not, itself, reveal discriminatory animus." *Humphries*, 2013 WL 6196561, at *9.

Finally, LeeHim fails to establish an inference of discrimination arising from her unequal pay claim. As discussed above, the complaint does not allege sufficient information regarding LeeHim's comparators to establish any disparity in salaries based on race.

The Court therefore holds that LeeHim has failed to plead sufficient facts from which to infer that defendants acted with discriminatory animus, whether based on her race or gender.[5]

---

[4] The Court need not consider whether such a claim might sound in First Amendment retaliation, as LeeHim has not pursued such a claim here.

[5] LeeHim's briefing says almost nothing about gender-based discrimination, and the complaint's scarce allegations concerning gender are entirely conclusory. *See, e.g.*, Compl. ¶ 1 (summarizing LeeHim's "race and gender-based discrimination" claims with repeated references to race but none to gender); *id.* ¶ 33 (categorizing LeeHim's discriminatory treatment "primarily as race-based" but potentially related to gender as well); *id.* ¶ 42a (citing a purported "gender gap in pay

C.  **Discrimination on the Basis of Race and Gender under the NYSHRL and the NYCHRL**

Having dismissed LeeHim's Title VII claim, the Court must next determine whether to exercise supplemental jurisdiction over her discrimination claims under the NYSHRL and the NYCHRL. Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Although supplemental jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), the exercise of jurisdiction is appropriate where the remaining state claims do not present any novel or unsettled questions of state law and their resolution would promote judicial efficiency. *See Mauro v. S. New England Telecomms., Inc.*, 208 F.3d 384, 388 (2d Cir. 2000).

As a threshold matter, the parties here debate whether LeeHim's state- and city-law claims were timely raised. *See* Def. Br. at 2–3; Pl. Br. at 13–14. This dispute turns on whether an EEOC charge tolls the statute of limitations for state- and city-law discrimination claims against a school board or its officers. Several lower courts in this Circuit have held that such claims are not tolled by EEOC filings. *See, e.g., Ayazi v. N.Y.C. Dep't of Educ.*, No. 08 Civ. 2456 (MKB), 2012 WL 4503257, at *8–9 (E.D.N.Y. Sept. 28, 2012); *Smith v. Tuckahoe Union Free Sch. Dist.*, No. 03 Civ. 7951 (PGG), 2009 WL 3170302, at *11 n.9 (S.D.N.Y. 2009); *but see Ritterband v. Hempstead Union Free Sch. Dist.*, No. 06 Civ. 6628 (DRH)(ETB), 2008 WL 3887605, at *9 n.9 (E.D.N.Y. Aug. 20, 2008) (tolling NYSHRL statute of limitations during pendency of EEOC complaint). The Court here has no occasion to reach this issue, because,

---

equity" without any reference to co-directors' genders). The foregoing analysis therefore applies *a fortiori* to gender-based discrimination.

even assuming that LeeHim's state- and city-law claims were timely filed, they are deficient under settled law applying both the NYSHRL and NYCHRL.

As to the NYSHRL, claims under it "are analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (citing *Torres v. Pisano,* 116 F.3d 625, 629 n.1 (2d Cir. 1997)). Accordingly, LeeHim's claims under the NYSHRL of race and gender discrimination must be, and are, dismissed.

As to the NYCHRL, race and gender discrimination claims are subject to a more liberal judicial construction than those brought under federal or state law. Claims under the NYCHRL "must be reviewed independently from and 'more liberally' than their federal and state counterparts." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); *see also Albunio v. City of N.Y.*, 16 N.Y.3d 472, 477–78 (2011) (NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 30 (1st Dep't 2009) ("[C]ourts [must] be sensitive to the distinctive language, purposes, and method of analysis required by the [NYCHRL], requiring an analysis more stringent than that called for under either Title VII or the [NYSHRL].").

Notwithstanding this more liberal standard of review, district courts must remain "mindful that the NYCHRL is not a general civility code." *Mihalik v. Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 110 (2d Cir. 2013) (internal quotation marks omitted). Thus, a plaintiff bringing NYCHRL claims still must show that the defendant's conduct was caused by a discriminatory motive, and courts "may still dismiss truly insubstantial cases" where it is clear as a matter of law "that the conduct complained of consists of nothing more than what a reasonable

victim of discrimination would consider petty slights and trivial inconveniences." *Id.* at 110–11 (internal quotation marks omitted).

Even under the NYCHRL, therefore, LeeHim would have to demonstrate conduct other than "petty slights" caused by a discriminatory motive. The complaint here fails to state such a claim. Even if the NYCHRL treated LeeHim's non-conclusory allegations of mistreatment as sufficiently adverse, she has failed, for the reasons stated above, to raise even a minimal inference of discriminatory motivation. Accordingly, the complaint must be dismissed even under the more liberal standards of the NYCHRL.[6]

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss the complaint with prejudice. The Clerk of Court is directed to terminate the motion pending at Dkt. 14 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 21, 2017
       New York, New York

---

[6] The Court informed LeeHim of her opportunity to amend her complaint in light of the motion to dismiss. Dkt. 17. Because LeeHim elected to defend her complaint rather than amend, the Court will not provide a further opportunity for amendment. *See Nightingale Grp., LLC v. CW Capital Mgmt., LLC*, No. 11 Civ. 9293 (PAE), 2012 WL 2674539, at *10–11 (S.D.N.Y. July 5, 2012); Judge Paul A. Engelmayer's Individual Rules and Practices in Civil Cases, Rule 3B, *available at* http://nysd.uscourts.gov/judge/Engelmayer ("If the non-moving party elects not to amend its pleading, no further opportunities to amend will ordinarily be granted, and the motion to dismiss will proceed in the normal course."). The Court therefore dismisses the complaint with prejudice.